# IN THE COURT OF APPEALS OF IOWA

———————————

No. 24-1312
Filed January 7, 2026

———————————

**State of Iowa,**
Plaintiff–Appellee,
v.
**Grant Adam Mead,**
Defendant–Appellant.

———————————

Appeal from the Iowa District Court for Polk County,
The Honorable Celene Gogerty, Judge.

———————————

**AFFIRMED**

———————————

Martha J. Lucey, State Appellate Defender, Maria Ruhtenberg (until
withdrawal), and Melinda J. Nye, Assistant Appellate Defenders, attorneys
for appellant.

Brenna Bird, Attorney General, and Nicholas E. Siefert, Assistant Attorney
General, attorneys for appellee.

———————————

Considered without oral argument
by Schumacher, P.J., Buller, J., and Mullins, S.J.
Opinion by Mullins, S.J.

1

**MULLINS, Senior Judge.**

Grant Mead was tried and convicted for eleven counts of sexual exploitation of a minor after investigators learned that someone using his internet protocol (IP) address uploaded child pornography to a file-sharing application. In this appeal, Mead challenges the sufficiency of the evidence, arguing the State failed to prove he was responsible for the uploads. He also contends that none of the photos or videos at issue depict a "live performance" by a minor victim, as required by statute. On both issues, we find substantial evidence supports the jury's verdict.

## I.      Background Facts and Proceedings

In July 2022, the National Center for Missing and Exploited Children (NCMEC)—an organization that helps monitor the internet for child sexual abuse activity—alerted local law enforcement that someone in Des Moines had uploaded sixteen child pornography files to Kik Messenger, a private chat and file-sharing application. All but one of the illicit files were uploaded from the same IP address between March 7, 2022 and March 23, 2022.[1] Data supplied by Kik showed the files were shared from the user "mollyfans17," whose account had been created in January using a Samsung phone, the name "Molly Neeb," and the email address "codya5456@gmail.com."

Detective Steven Bjurstrom used the details supplied by the NCMEC to investigate other online activity associated with the Kik user. In response to a search warrant, Google confirmed that "codya5456@gmail.com" was an email account created in 2018 by someone who used the name "Cody Adam"

---

[1] The sixteenth file was uploaded from a separate Des Moines IP address on February 1, 2022.

and a date of birth in 1991.[2]  The user provided no personal phone number or recovery email address.  According to detective Bjurstrom, "there was not a significant amount of data associated with the account," and incoming emails consisted primarily of notifications from other platforms.  This led police to believe the email address had been created for the purpose of opening other web accounts.

Among the other accounts created with the "codya5456@gmail.com" email address was a private Instagram profile showing the username "codyadam6."  An information request to Instagram revealed that a phone number had been used to verify the account at the time it was opened.  Detective Bjurstrom linked the same phone number to contact information supplied by Mead in a 2021 police report.  He soon determined that Mead was pictured in a profile photo on the "codyadam6" Instagram account, as well as in photographs posted to a second "codyadam" social media profile.  On another website, pictures of Mead were associated with the moniker "DJ Cody."

In addition to investigating the email account behind the Kik Messenger profile, police also traced the IP address from which the illicit files were uploaded.  As detective Bjurstrom would explain at trial, IP addresses are oftentimes "dynamic," meaning the same address might be assigned to different internet subscribers over time.  However, an internet service provider confirmed that the address used for the Kik uploads was assigned to Mead's home for almost the entire month of March 2022.  During that period, it was used to access the "mollyfans17" account sixty-five times.

---

[2] Police would later find out that the date of birth used to create the Gmail account was Mead's.

In March 2023, investigators executed a search warrant at Mead's residence, where they seized multiple smart phones and other electronic devices. Some of the phones had no data, indicating their memory either had failed or was wiped clean. The Samsung phone used to create the "mollyfans17" Kik Messenger account was not located. Nor was evidence of child pornography found on any of the devices from Mead's home. However, data found on one iPhone confirmed that it had been used to access the "codyadam" Gmail account and social media profiles associated with that name.

The State charged Mead with eleven counts of sexual exploitation of a minor by promotion, a class "D" felony under Iowa Code section 728.12(2) (2022).[3] A jury found him guilty. Mead now appeals, arguing the trial evidence is insufficient to support his convictions.

## II. Standard of Review

We review challenges to the sufficiency of the evidence for correction of errors at law. *State v. McCollaugh*, 5 N.W.3d 620, 623 (Iowa 2024). In deciding whether the State met its burden, we must "consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013) (citation omitted). "[W]e do not resolve conflicts in the evidence, pass upon the credibility of witnesses, or weigh the evidence," as those functions are for the jury. *State v. Schooley*, 804 N.W.2d 105, 106 (Iowa Ct. App. 2011). Instead, we must uphold a verdict if it is supported by "substantial evidence," which is evidence that could

---

[3] The State's eleven charges corresponded with each of the eleven minor victims depicted in the photo and video files uploaded to Kik, some of which were duplicates.

"convince a rational jury that the defendant is guilty beyond a reasonable doubt." *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012).

## III. Discussion

The district court instructed the jury that it could convict Mead on each count only if the State proved the following elements:

> 1. On or about February 1, 2022 through March 23, 2022, the defendant knowingly promoted a material.
>
> 2. The material depicted a live performance of a person under the age of 18 years engaging in a prohibited sexual act or in the simulation of a prohibited sexual act.

*See* Iowa Code § 728.12(2). The instructions defined the word "promote" to include delivering, transferring, distributing, and disseminating. "Material" was defined to mean "any picture, drawing, photograph, motion picture, or other pictorial representation," including a "recording" or an "electrical reproduction."

Mead argues the State's evidence fell short in two different respects. He first contends it failed to show that he was the internet user responsible for promoting the illicit files. Mead also argues the evidence was insufficient to prove that any of the uploads depicted a "live performance" of a minor engaged in a prohibited sexual act. We address these claims in turn.

### A. Identity

Mead's trial defense primarily focused on the limited evidence surrounding the "mollyfans17" Kik account. On cross-examination, Detective Bjurstrom acknowledged that police obtained no chat history from the Kik Messenger account, nor did they attempt to trace the separate IP address used to create the account in January 2022. He also conceded that

the email information used to open the Kik account was unverified, meaning the person who created the account was not necessarily the owner of "codya5456@gmail.com."[4] Detective Bjurstrom further testified that police had declined to pursue the name "Molly Neeb" after a law-enforcement database search produced no results. And they did not investigate whether the "mollyfans17" account remained active after March 2022.

Mead also challenged the State's evidence regarding the IP address used for the uploads, arguing that anyone connected to Mead's wi-fi router could have accessed the internet through his IP address. Detective Bjurstrom agreed on this point. But he also explained that the only people living at Mead's residence at the time of the search were Mead and his fiancé. Mead's fiancé was interviewed, although she was quickly dismissed as a suspect.[5] Police did not seize her electronic devices, which were beyond the scope of their warrant. According to detective Bjurstrom, no other users of Mead's IP address were identified following the search of the house.

Reprising his arguments from trial, Mead contends the State failed to rule out the possibility that someone else was behind the "mollyfans17" account. We agree there are no facts to directly contradict Mead's theory that some other "Molly Neeb" used his email address and internet connection to create and access the incriminating Kik account. There's just one problem: the jury rejected that explanation. And on review for sufficiency of the evidence, we may not override the jury's judgment by

---

[4] Records from Google confirmed, however, that five months after the Kik account was created, someone using the same model of Samsung phone successfully logged-in to the Gmail account.

[5] Mead's fiancé did not testify at trial. Although we omit her name for present purposes, we note that it is not Molly Neeb.

drawing an inference contrary to the verdict. *See State v. Ernst*, 954 N.W.2d 50, 57–58 (Iowa 2021) (explaining that "a court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution" (cleaned up)); *United States v. Caruso*, 63 F.4th 1197, 1202 (8th Cir. 2023) (finding "[t]he jury was free to reject" a defendant's theory that a friend accessed his online account and uploaded child pornography).

Although Mead would have it differently, our only role is to evaluate whether substantial evidence supports the jury's conclusion. We find that standard satisfied. The State showed that all but one of the sixteen child pornography files were uploaded to the "mollyfans17" Kik account from Mead's IP address, which was also used to access the account on fifty other occasions during the month of March 2022. True, there were two people living at Mead's house during that time period. But the State's evidence showed that one of them had a history of using "codya5456@gmail.com" and other aliases to create anonymous social media profiles. That person was Mead. And data from Mead's iPhone confirmed he had used the device to log in to those accounts.

We recognize that police never recovered the Samsung phone used to create the "mollyfans17" account, nor did they locate any child pornography on Mead's devices. However, Mead's home was not searched until nearly a year after the NCMEC flagged the Kik uploads. At that time, multiple phones in Mead's possession were empty of user data. And the only one that contained recoverable information—Mead's iPhone—was equipped with a tool called "VirtualShield," which Bjurstrom testified could be used to mask an internet user's IP address during online activity. Notably, the NCMEC

7

reported that the "mollyfans17" Kik account had been accessed on at least one occasion using a VirtualShield connection. Given these facts, we do not consider the missing contraband dispositive. A rational jury could infer that, by the time of the search, Mead had taken steps to conceal or eliminate evidence of his criminal conduct.

While Mead's alternative-perpetrator theory cannot be affirmatively disproved, "the State was not required to refute every possible inference from the evidence"—only to establish Mead's guilt beyond a reasonable doubt. *Ernst*, 954 N.W.2d at 57. Viewing the record in the light most favorable to the State, a rational jury could find beyond a reasonable doubt that Mead was responsible for the Kik uploads.

## B. "Live Performance"

Mead next argues that his convictions cannot stand because none of the child pornography at issue depicted "a live performance" of a minor engaging in prohibited sexual acts.[6] On Mead's interpretation, the phrase "live performance" refers to a display taking place "before an audience." He therefore asserts the materials charged in this case cannot support a conviction under section 728.12(2) because they depict child sex acts that were not performed before an audience.

As a threshold issue, the State contends that Mead failed to preserve error on his live-performance argument. It acknowledges that sufficiency-of-the-evidence claims are generally exempt from preservation requirements. *See State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). However, the State

---

[6] Mead does not dispute that each of the photos and videos uploaded to Kik shows a minor engaged in a prohibited sexual act. In Mead's words, "the material is certainly child pornography"—just not the kind criminalized by Iowa Code section 728.12(2).

suggests that Mead's argument is an instructional challenge in sufficiency clothes. It asserts that if Mead had raised his live-performance defense at trial, "then the State could have responded and the district court could have considered and ruled upon the issue, perhaps agreeing to an additional definitional jury instruction." But Mead never did so.

The State is right that Mead's claim is not a traditional sufficiency challenge. Everyone agrees what the evidence shows. None of the Kik uploads involve sex acts performed to an audience. In *Crawford*, the defendant challenged the jury's conclusion that he possessed ten or more "dosage units" of heroin, arguing the State's evidence failed to meet that element under the definitions supplied by Iowa Code section 453B.1(6) and a matching jury instruction. *Id.* at 194, 202–03. Although that claim was never raised to the district court, the supreme court found it was preserved for review, reasoning a trial and conviction necessarily preserve error "with respect to any challenge to the sufficiency of the evidence." *Id.* at 202 ("The trial itself raises the issue of the sufficiency of the evidence, and the verdict is the decision on the issue.").

Mead's claim, by contrast, hinges entirely on a legal question about the scope of section 728.12(2). He asks us to define the elements of his offense rather than evaluate the evidence supporting them. We question whether *Crawford* ever intended to exempt "sufficiency" challenges like Mead's. *See id.* at 199 (noting that a district court's ruling on the sufficiency of the evidence does not "change the course of [the] trial process itself, in contrast to, for example, objections to . . . jury instructions").[7] But we decline to

_____

[7] *But see State v. Meisheid*, 26 N.W.3d 800, 803 (Iowa 2025) (resolving whether a defendant's undisputed display of a handgun was "toward" deputies for purposes of Iowa Code section 708.1(2)(c), despite the fact that the undisputed jury instructions did not define that term); *State v. Crawford* (*Crawford II*), 974 N.W.2d 510, 521 (Iowa 2022)

9

resolve that issue today. Instead, we will assume that error is preserved and proceed to the merits of Mead's argument that he did not promote the kind of material criminalized by the statute under which he was convicted.[8]

Section 728.12 prohibits "the creation, dissemination, and possession of child pornography." *State v. Robinson*, 618 N.W.2d 306, 316 (Iowa 2000) (emphasis omitted). At the time of Mead's offense, the statute stated in relevant part:

> 1. It shall be unlawful to employ, use, persuade, induce, entice, coerce, solicit, knowingly permit, or otherwise cause or attempt to cause a minor to engage in a prohibited sexual act or in the simulation of a prohibited sexual act. A person must know, or have reason to know, or intend that the act or simulated act may be photographed, filmed, or otherwise preserved in a visual depiction. . . .
>
> 2. It shall be unlawful to knowingly promote any material visually depicting a live performance of a minor engaging in a prohibited sexual act or in the simulation of a prohibited sexual act. . . .
>
> 3. It shall be unlawful to knowingly purchase or possess a visual depiction of a minor engaging in a prohibited sexual act or the simulation of a prohibited sexual act.

---

(addressing whether the defendant's unlawful activity was conducted on a "continuing basis" for purposes of Iowa Code section 706A.2(1), notwithstanding the lack of a definitional instruction).

[8] Typically, we conduct a sufficiency review within the framework of the instructions submitted to the jury. *State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009) (explaining unchallenged jury instructions are "the law of the case for purposes of our review of the record for sufficiency of the evidence"). But here, the instructions did not define the phrase "live performance," and so we may look to the statute to determine the law. *Crawford II*, 974 N.W.2d at 521 ("Our law of the case doctrine is premised on the failure to object to an incorrect statement of the law. . . . But failing to fully define a term is a different matter.").

Iowa Code § 728.12(1)–(3). These three subsections describe distinct offenses that are subject to escalating penalties, ranging from an aggravated misdemeanor for first-time possession of child pornography, *see id.* § 728.12(3), to a class "D" felony for promotion, *see id.* § 728.12(2), to a class "C" felony for production-related activities, *see id.* § 728.12(1).[9] Although all three provisions discuss depictions of child sex acts, only subsection (2) refers to depictions of "a live performance." The statute does not define that phrase.

Mead argues that the distinct language of subsection (2) indicates a legislative intent to regulate a narrow category of visual depictions—specifically, those showing a child performing prohibited sexual acts to an audience. As his primary support, he points to obscenity statutes in other states defining similar words in that manner. *See, e.g.*, Conn. Gen. Stat. § 53a-193(11) (2024) (stating a "performance" is "any play, motion picture, dance or other exhibition performed before an audience"); Wash. Rev. Code § 9.68A.011(4) (2024) (defining "live performance" as "any play, show, skit, dance, or other exhibition performed or presented to or before an audience of one or more").

Of course, we do not begin with outside statutes when interpreting Iowa law. The proper starting point is the language chosen by our legislature. *State v. Flynn*, 13 N.W.3d 843, 846 (Iowa 2024). Only when presented with a genuine ambiguity may we look beyond the statutory text. *McCollaugh*, 5 N.W.3d at 623 (explaining the "inquiry ends if we find no ambiguity because we do not search for the meaning of a statute beyond the express language" (cleaned up)). A statute is ambiguous when "reasonable minds can disagree

---

[9] The statute was amended in 2023 to increase the penalty for each of the three offenses it describes. 2023 Iowa Acts ch. 74, § 2.

on the meaning of particular words or the statute as a whole." *State v. Geddes*, 998 N.W.2d 166, 173 (Iowa 2023) (citation omitted).

Looking to the plain meaning of the phrase "live performance," we find no such ambiguity. A commonplace definition of the word "live" is "having life." *Live*, Webster's Third New International Dictionary 1323 (unabr. ed. 2002) (hereinafter "Webster's Third"). And a "performance" is "the act or process of carrying out something." *Performance*, Webster's Third at 1678. Taken together, these words plainly describe an action carried out by a living actor—specifically, a prohibited sexual act by a real-life minor. It is therefore apparent that section 728.12(2) criminalizes promotion of child pornography featuring actual children, as opposed to artificial representations of make-believe minors.[10]

We grant Mead's point that, in other contexts, a "live performance" could describe a contemporaneous display before an audience. *See Live*, Webster's Third at 1324 (noting an alternative definition of "live" is "relating to a performance done without mechanical reproduction"). But just because an interpretation is conceivable does not make it reasonable. *See State v. Gardner*, 18 N.W.3d 487, 490 (Iowa 2025) (stating a "statute is not ambiguous just because two parties disagree about its interpretation"). Mead's interpretation would narrow the term "live performance" to "live

---

[10] While it is not our job to speculate about the reasons for the legislature's clear words, *McCollaugh*, 5 N.W.3d at 623, we find it noteworthy that the United States Supreme Court has used the very same language to distinguish unprotected depictions of child sexual conduct from those that fall within the ambit of the First Amendment. *See New York v. Ferber*, 458 U.S. 747, 764–65 (1982) ("We note that the distribution of descriptions or other depictions of sexual conduct, not otherwise obscene, which do not involve live performance or photographic or other visual reproduction of live performances, retains First Amendment protection.").

performance before an audience," thus limiting the reach of section 728.12(2) to an exceedingly narrow—and seemingly unlikely—subset of child pornography. The legislature could have easily limited subsection (2), but it did not. If it had, Iowans would be at liberty to distribute depictions of a live performance of child sexual abuse that was not performed in front of an audience, in stark contrast to the broad categories of material criminalized by subsections (1) and (3). We cannot accept an interpretation that carves such an expansive gap in a comprehensive statutory scheme when our legislature did not expressly do so. *See Robinson*, 618 N.W.2d at 318 ("It is clear from a reading of chapter 728 that the legislature sought to entirely eradicate child pornography from this state."); *Calcaterra v. Iowa Bd. of Med.*, 965 N.W.2d 899, 904 (Iowa 2021) (noting that even when "initially determining whether ambiguity exists," a statute must "be read as a whole").

Contrary to Mead's position, we conclude that the reach of section 728.12(2) is not limited to depictions of children engaged in sexual displays before a live audience. The statute prohibits promotion of materials depicting minors performing prohibited sexual acts in real life.[11] And that is

---

[11] We reach this conclusion based only on text of the statute under which Mead was charged. That said, we note that our legislature has since amended section 728.12 to clarify that a "visual depiction of a minor" for purposes of subsection (3) "includes any visual depiction that has been created, adapted, or modified to give the appearance that an identifiable minor is engaged in a prohibited sexual act." 2024 Iowa Acts ch. 1015, § 1. The amendment explicitly declined to extend this definition to subsection (2), confirming our understanding that the distinct language of that subsection—"live performance"— refers to materials depicting real-life minors, as opposed to materials "created, adapted, or modified to give the appearance" of a minor. Where a clarificatory amendment makes no change to part of a statute, we take it as a sign that the unaltered words meant what they said. *See JBS Swift & Co. v. Ochoa*, 888 N.W.2d 887, 899 (Iowa 2016) (noting the

precisely how the State asked the jury to read its instructions at trial, arguing: "Live performance. It's not a drawing. Those were actual photos. That was actually a little girl [shown in one distinctive photo]." Because there is no dispute that each of the photos and videos in this case depicted a real-life child engaged in prohibited sexual activity, the jury correctly concluded that the Kik uploads promoted "material visually depicting a live performance."

## IV. Conclusion

Substantial evidence supports the jury's verdict on both elements challenged by Mead. Because he appeals each of his eleven convictions on identical grounds, we affirm Mead's convictions in their entirety.

**AFFIRMED.**

---

presumption that "when the legislature amends a statute and leaves some of it unchanged, the unchanged provision retains its prior meaning").